UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CHELSEA SPRAGUE,

            Plaintiff,

    v.

CAROLYN W. COLVIN,  Acting
Commissioner of Social Security,[1]

        Defendant.

Case No. 3:12-cv-00780-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Chelsea Sprague ("Sprague"), seeks judicial review of the final decision by

the Social Security Commissioner ("Commissioner") denying her application for

Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC §§ 1381-1383f.

This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC

§ 405(g) and § 1383(c)(3).  All parties have consented to allow a Magistrate Judge to enter

final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to
FRCP 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

1 – OPINION AND ORDER

For the reasons set forth below, the Commissioner's decision is REVERSED and REMANDED for further proceedings.

## ADMINISTRATIVE HISTORY

Sprague protectively filed for SSI on November 26, 2008, alleging a disability onset date of October 15, 2002.[2]  Tr. 124-29.[3]  Her application was denied initially and on reconsideration.  Tr. 73-87.  On November 30, 2010, Administrative Law Judge ("ALJ") Catherine R. Lazuran held a hearing at which Sprague was represented and testified, as did her mother, Brenda Witherspoon, and a Vocational Expert ("VE"), Gail Young.  Tr. 35-72. The ALJ issued a decision on January 28, 2011, finding Sprague not disabled within the meaning of the Act.  Tr. 10-21.  On April 11, 2011, after considering Sprague's additional evidence, the Appeals Council denied her request for review, making the ALJ's decision the Commissioner's final decision subject to review by this court.  Tr. 1-5.  20 CFR §§ 416.1481, 422.210.

## BACKGROUND

Born in 1989, Sprague was 21 years old at the time of the hearing before the ALJ. Tr. 38, 124.  She has a GED and no past relevant work experience.  Tr. 38, 163.  Sprague alleges that she is unable to work due to the combined impairments of Fanconi's anemia[4] and schizoaffective disorder.  Tr. 86-87, 136.

///

///

---

[2]  Sprague received childhood disability payments from April 15, 2003, to July 2008.  Tr. 143-44.

[3]  Citations are to the page(s) indicated in the official transcript of the record filed on October 5, 2012 (docket # 11).

[4]  Fanconi's anemia is characterized by progressive pancytopenia, hypoplastic bone marrow, skeletal anomalies (as short stature), microcephaly, hypogonadism, and a predisposition to leukemia.

2 – OPINION AND ORDER

# DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 416.920(a)(4)(v) & (g), 416.960(c).

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Sprague has not engaged in substantial gainful activity since November 26, 2008, the date that the application was protectively filed. Tr. 12. At step two, the ALJ determined that Sprague has the severe impairments of Fanconi's anemia, degenerative disc disease of the lumbar and thoracic spine, and a mood disorder. *Id*.

At step three, the ALJ concluded that Sprague does not have an impairment or combination of impairments that, either singly or in combination, meets or equals any of the listed impairments. Tr. 13.

With respect to how her impairments affect her ability to work, the ALJ concluded that Sprague has the RFC to perform light work, except she can only "occasionally climb, stoop, kneel, crouch and crawl. [She] should avoid exposure to hazards such as unprotected

heights.  [She] can do simple, routine, repetitive tasks but not detailed tasks and can get along with others."  Tr. 14.

At step four, the ALJ determined that Sprague has no past relevant work.  Tr. 20.  At step five, the ALJ found that given Sprague's age, education, and RFC, she was capable of performing two jobs identified by the VE that exist in significant numbers in the national economy.  Tr. 20-21.

Accordingly, the ALJ determined that Sprague was not disabled at any time between November 26, 2008, the date the application was protectively filed, and the date of her decision, January 28, 2011.  Tr. 21.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## DISCUSSION

Sprague argues that the ALJ erred by: (1) failing to account for all of her limitations in her RFC; (2) improperly discounting her credibility; and (3) improperly rejecting her mother's testimony.

## I.    RFC

Sprague contends that the RFC assigned by the ALJ is inaccurate because it fails to properly account for the limitations caused by her Fanconi's anemia, mood disorder, fibromyalgia, seizures, and anxiety.  The RFC assessment describes the work-related activities a claimant can still perform on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments.  20 CFR § 416.945(a); SSR 96-8p.  The ALJ must reach the RFC assessment based on all the relevant evidence in the case record, including medical reports and the effects of symptoms that are reasonably attributable to a medically determinable impairment.  *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 883 (9th Cir 2006).  The ALJ, however, need not incorporate limitations identified through claimant testimony or medical opinions that the ALJ permissibly discounted.  *Batson*, 359 F3d at 1197.

### A.    Fanconi's Anemia

Although the ALJ concluded that her Fanconi's anemia is a severe impairment, Sprague contends that the RFC fails to fully account for the associated fatigue, pain, and sustainability issues.

The ALJ found that "the medical record in December 2009 shows stable decreased blood counts and no past marrow abnormality," and that before December 2009, Sprague had no laboratory testing done for nearly two years due to lack of insurance.  Tr. 16.  The ALJ also gave "great weight" to the opinion of DeWayde Perry, M.D., an examining physician, who concluded

on March 5, 2009, that despite her complaints of "daily fatigue, chronic bone and joint pain, and occasional blurry vision," Sprague has the physical capacity to stand or walk up to six hours, carry 20 pounds occasionally and 10 pounds frequently, and has no limitations on her ability to sit, climb, or balance, though due to her joint pain, she should only occasionally stoop, kneel, crouch, and crawl. *Id.* Dr. Perry also concluded that Sprague does not need an assistive device and has no manipulative or environmental limitations. *Id.* Finding this opinion to be consistent with the medical record and opinions of the state agency consulting physicians, the ALJ adopted these limitations in Sprague's RFC. *Id.* However, in "an abundance of caution," the ALJ also added restrictions on climbing and hazards due to Sprague's complaints of dizziness. *Id.*

The ALJ went on to note that two state agency consulting physicians, Neal Berner, M.D., and Richard Alley, M.D., also agreed with Dr. Perry's conclusions regarding Sprague's physical capacity. Tr. 17. Dr. Berner and Dr. Alley concluded that Sprague could perform light work, except that she can only frequently (as opposed to continuously) balance and climb ramps and stairs and occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds. *Id.* The ALJ incorporated the limitations set forth by Drs. Perry, Berner, and Alley by concluding that Sprague has the RFC to perform light work, but can only "occasionally climb, stoop, kneel, crouch, and crawl" and should also "avoid exposure to hazards such as unprotected heights." Tr. 14.

Though the ALJ does not specifically ascribe any psychological limitations related to Fanconi's anemia, she does give weight to the opinions of several physicians who concluded that Sprague can understand, remember, and carry out simple (but not detailed) instructions, and could probably get along well with people. *Id* (citing the conclusions of examining psychiatrist,

Gayle Smolen, M.D., and consulting psychologists, Robert Henry, Ph.D., and Paul Rethinger, Ph.D.). The ALJ incorporated these limitations into the RFC by stating that Sprague can do only "simple, routine, repetitive tasks but not detailed tasks" and "can get along with others." *Id*.

While the ALJ correctly stated the positions of the various physicians whose opinions she adopted, she completely failed to discuss the opinions of two of Sprague's treating physicians regarding the symptoms associated with her Fanconi's anemia. These sources frequently described how Sprague's fatigue and pain would wax and wane and tend to increase with increased activity.

Specifically, the ALJ completely ignored letters written by Peter Kurre, M.D., Sprague's hematologist who treated her regularly from 2007 to 2010, and Rebecca Swiff, M.D., Sprague's psychiatrist from 2003 to 2008. In a letter dated August 29, 2007, to Sprague's high school, Dr. Kurre explained that Sprague's Fanconi's anemia causes "episodic fatigue and easy exhaustion in the classroom" and that the "rigorous school environment and unremitting pace often do not work well for these patients." Tr. 489. He asked for "consideration and accommodation" to assist Sprague in meeting graduation requirements. *Id*. A few days later, on September 5, 2007, Dr. Swiff wrote a letter asking that, due to chronic pain and fatigue caused by Fanconi's anemia, Sprague be permitted to complete her senior year online and receive a modified diploma. Tr. 492. Dr. Swiff noted that "attending school is too physically taxing which in turn aggravates her anxiety." *Id*. Though these physicians treated Sprague for many years, the ALJ failed to even mention either of their opinions which directly relate to Sprague's limitations regarding fatigue and pain, albeit in the classroom as opposed to in the workplace.

In weighing the medical evidence, the ALJ generally affords enhanced weight to the opinion of the claimant's treating physicians if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other substantial evidence in the record. 20 CFR § 416.927(c)(2). "Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F3d 1155, 1164 (9th Cir 2008) (citation omitted). An uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick*, 157 F3d at 725, citing *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). Moreover, several factors determine the weight the ALJ should give to a physician's opinion, including the length of the treatment relationship and frequency of examination, the amount of evidence that supports the opinion, the consistency of the medical opinion with the record as a whole and the physician's specialty and understanding of the disability program. *Orn v. Astrue*, 495 F3d 625, 631-632 (9th Cir 2007). When "the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'" *Lester*, 81 F3d at 834, quoting *Hammock v. Bowen*, 879 F2d 498, 502 (9th Cir 1989).

Both Dr. Kurre and Dr. Swiff treated Sprague on a regular basis for many years. The silence of the consulting physicians regarding the limiting effects of Sprague's complaints of fatigue and pain may be reasonably construed as concluding that Sprague suffers no such limitations. Accordingly, the opinions of the consulting physicians contradict the opinions

of Drs. Kurre and Swiff, requiring the ALJ to give specific and legitimate reasons, supported by evidence in the record, to reject their opinions.

The ALJ not only failed to provide any reasons for rejecting their opinions, but also ignored their opinions and treatment notes entirely, other than to excerpt select portions regarding Sprague's activities of daily living. Tr. 19. The ALJ made only one reference to the pain and fatigue associated with Fanconi's anemia, stating that "[w]hile the pain and fatigue secondary to the claimant's Fanconi's anemia are noted and the long term prognosis is uncertain, the current laboratory findings show stable decreased blood counts and no past marrow abnormality." *Id*. This statement is accurate, but ignores many treatment notes stating that Sprague often experienced unexplained pain despite her stable decreased blood counts and normal bone marrow biopsies.

For example, on January 17, 2005, Dr. Swiff noted that Sprague was missing a lot of school due to seizures and non-specific pain even though her blood tests were so good that her next scheduled bone marrow biopsy had been pushed back three months. Tr. 522. On April 18, 2005, Dr. Swiff noted that Sprague's pain was not relieved by her usual pain management methods and was interfering with her school attendance, yet the etiology was of unknown origin because all the tests were negative. Tr. 519. Dr. Swiff routinely noted Sprague's struggles with fatigue and pain and over the course of several years documented that it was getting in the way of her school performance and attendance. *See* Tr. 525 (noting that Sprague was getting farther behind in school due to exhaustion by the afternoon); Tr. 523 (noting that Sprague had not attended school for two weeks because of pain caused by Fanconi's anemia which was "one of the longer episodes" and not responding to pain medication).

10 – OPINION AND ORDER

On February 15, 2007, Dr. Kurre noted that Sprague was attending school only part-time due to her "relatively easy onset of fatigue," but that her blood counts indicated "an overall stable hematologic situation."  Tr. 272-73.  On August 23, 2007, Dr. Kurre noted that even though Sprague's latest blood counts indicated that her Fanconi's anemia was stable and her most recent bone marrow biopsy revealed no abnormalities, Sprague's frequent fatigue was interfering with her ability to regularly attend school.  Tr. 245-46. Though Sprague received no regular medical treatment for nearly two years when she had no health insurance, once she began seeing Dr. Kurre again in December 2009, his notes again document pain and fatigue of unclear etiology.  Tr. 441-42 (December 10, 2009), 584-86 (April 8, 2010).

Both Drs. Kurre and Swiff opined that Sprague needed accommodation in order to finish high school due to her frequent pain and fatigue.  Although their opinions were rendered in 2007, one year before Sprague protectively filed for adult disability,[5] they are still relevant to the disability analysis, given the length of the treating relationships and consistent reports of fatigue and pain.  Moreover, their opinions regarding Sprague's fatigue and pain were corroborated by other treating sources.  *See* Tr. 221 (a special education team noted in 2006 that Sprague exhibited "limited strength, vitality, or alertness . . . that results in limited alertness with respect to the educational environment."); Tr. 260-62 (Lisa D. Madison, M.D., noted in 2007 that Vitamin D had helped Sprague's bone pain initially, but after about a year, the pain returned); Tr. 490 (Amy Kenagy, MS, RN, CPNP, noted in 2007 that Sprague was taking Gabapentin for her chronic pain and that the side effects included

---

[5] Though Sprague alleged a disability onset date of October 15, 2002, at the hearing the ALJ modified the alleged onset date to November 26, 2008, the date the application was protectively filed.  Tr. 10, 21.  Sprague received childhood disability payments until July 2008.  Tr. 143-44.

drowsiness and fatigue, which made "attending day-to-day classes harder for her, especially given her Fanconi's anemia"); Tr. 214-17 (school psychologist Michele Eddy-Malott concluded in 2007 that Sprague's difficulties in school were "related to her chronic medical issues"); Tr. 418-21, 589 (Barbara Hettinger, M.D., noted in 2009 and 2010 that Sprague was struggling with chronic fatigue); Tr. 550-55 (Joanne Miracle, ANP, began treating Sprague for chronic pain in 2010, noting that she met the criteria for fibromyalgia). Sprague also presented at the emergency room many times for complaints of fatigue and pain. *See* Tr. 231-32, 409-15, 560-67, 569-74. Nothing in the record indicates a dramatic improvement in Sprague's pain and fatigue due to Fanconi's anemia after 2007.

The bottom line is that the ALJ completely ignored evidence related to Sprague's Fanconi's anemia and corresponding symptoms of fatigue and pain, and how these symptoms limit her daily activities. The ALJ failed to provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the opinions of Drs. Kurre and Swiff regarding Sprague's fatigue, pain, and corresponding limitations. Consequently, these opinions must be credited as true as a matter of law. *Lester*, 81 F3d at 834. Crediting these opinions as true, Sprague's Fanconi's anemia caused "episodic fatigue and easy exhaustion," which prevented her from performing well in a "rigorous . . . environment" or at an "unremitting pace" and made regular attendance "too physically taxing." Tr. 489, 492. The RFC does not account for these limitations in any way. Thus, it is not an accurate statement of the work-related activities Sprague can perform on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments.

///

///

B.     __Mood Disorder__

Sprague contends that despite finding her mood disorder a severe impairment, the ALJ

erred by failing to account for the associated social and environmental limitations.  The RFC

indicates that Sprague can "do simple, routine, repetitive tasks but not detailed tasks[,] can get

along with others" and "should avoid exposure to hazards such as unprotected heights."  Tr. 14.

Sprague argues that the ALJ should have included a limitation restricting her from public contact

and requiring a predictable, non-hazardous work setting.

The ALJ discussed Sprague's psychological impairment in some detail, noting that the

medical record consistently reports that she suffers from schizoaffective disorder.  Tr. 17.  The

ALJ cites to one treatment note by Dr. Swiff in June 2008, prior to the alleged date of onset

selected by the ALJ, stating that Sprague's mood varied from good to depressed, but her

thoughts were clear, goal directed, without hallucinations or delusions, and overall "stable."  *Id*,

citing Tr. 363.  In forming Sprague's mental RFC, the ALJ primarily relied on the opinions by

examining psychiatrist, Dr. Smolen, and consulting psychologists, Drs. Henry and Rethinger.  *Id*.

On July 9, 2008, Dr. Rethinger completed a Mental RFC Assessment.  Tr. 467-69.

Dr. Rethinger concluded that Sprague suffers only moderate limitations in her ability to

understand, remember, and carry out detailed instructions, interact appropriately with the

general public, be aware of normal hazards and take appropriate precautions, and set

realistic goals or make plans independently of others.  Tr. 467-68.  Dr. Rethinger

summarized his conclusions regarding Sprague's functional capacity as follows:

> She has the ability to understand/remember/carry out simple
> instructions only, she would be unable to complete detailed
> types of instructions.  She has the ability to sustain
> atten[tion]/concent[ration]/persist[ence] for simpler tasks, but
> [is] unable to complete detailed tasks/routines.  She would do
> best with limited public contact, but can get along with others.

> She needs a predictable, nonhazardous job setting due to her
> MDI and physical problems and needs help from VRD in goal
> setting.

Tr. 469.

That same day, Dr. Rethinger completed a Psychiatric Review Technique form. Tr. 471-85.  He concluded that Sprague suffers from "psychotic d/o stable" and "anxiety c/o" which do not precisely satisfy the diagnostic criteria to meet or equal a listing.  Tr. 473, 476.  He found that Sprague has moderate limitations in maintaining concentration, persistence, or pace, and only mild limitations in her ability to engage in activities of daily living and maintaining social functioning.  Tr. 481.  The ALJ gave "significant weight" to this opinion Tr. 17.

On February 27, 2009, at the request of DDS, Dr. Smolen performed a psychodiagnostic evaluation.  Tr. 365-68.  Dr. Smolen noted that both Sprague and her mother "were considered to be reliable and that Sprague stopped her education her senior year of high school because she found it hard to focus.  Tr. 365.  Sprague was not taking any medication due to lack of insurance and described her petit mal seizures as "not too bad." *Id.*  She reported performing some housework, depending on how she is feeling on a particular day, though she noted that sometimes her pain flares up and gets so bad that she is bedridden up to three weeks at a time.  Tr. 366.  The pain flares up daily and can last anywhere from five minutes to two months.  *Id.*  Sprague takes daily walks and sometimes helps prepare dinner, but has to know ahead of time or else she will "freak." *Id.*  She cannot follow written instructions, but does better at hands-on instruction, and can watch a half-hour TV show and explain what happened to someone who had not seen the show.  Tr. 367. Most of the time her energy level is above normal, but when she is feeling pain, it is "like

the world stops." *Id*.  Dr. Smolen diagnosed Sprague with schizoaffective disorder, Fanconi's anemia, petit mal seizures, hypothyroidism, and diabetes.  *Id*.  Though Sprague has auditory hallucinations, paranoid thoughts, and "doubting, depressive moments" associated with schizoaffective disorder, overall her energy level is "a little bit above normal." *Id*.  Dr. Smolen concluded that Sprague "would be able to remember and understand and concentrate and attend with only mild impairment" and "would be able to get along well with people."  Tr. 367-68.  The ALJ gave this opinion "weight because it is consistent with the medical record as a whole, [her] examination, and the evidence regarding [Sprague's] daily activities." Tr. 17.

On April 30, 2009, based on a review of the record, Dr. Henry determined that Sprague's schizoaffective disorder was not a severe impairment.  Tr. 384-97.  He found that that Sprague has only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace, and no episodes of decompensation.  Tr. 394.  He noted that Sprague shows only mild impairment with remembering, understanding, concentration, and attention, and exhibits normal social functioning.  Tr. 396.  Dr. Rethinger affirmed this opinion, noting that Sprague is socially appropriate and has independent activities of daily living.  Tr. 403.  The ALJ gave this opinion "significant weight."  Tr. 17.

Sprague argues that the ALJ erred by failing to incorporate Dr. Rethinger's July 2008 opinion that Sprague needs "limited public contact" and a "predictable, nonhazardous job setting."  Tr. 469.  Though Dr. Rethinger did opine that Sprague would "do best" with limited public contact, he also stated in that same sentence that she "can get along with others."  *Id*.  One year later, Dr. Rethinger agreed with Dr. Henry's opinion that Sprague exhibited

"normal social functioning," specifically noting that Sprague is "able to be socially appropriate." Tr. 403.  Furthermore, Dr. Smolen concluded that Sprague would be able to "get along well with people."  Tr. 368.  The ALJ ultimately concluded that Sprague could "get along with others" (Tr. 14), which is clearly supported by both of Dr. Rethinger's opinions, as well as by Drs. Smolen and Henry regarding her social functioning. Consequently, this portion of the RFC is supported by the medical evidence.

As for Dr. Rethinger's opinion that Sprague needs a "predictable, nonhazardous job setting," the ALJ did incorporate this restriction when restricting Sprague from "exposure to hazards such as unprotected heights."  Tr. 14.  No other physician rendered an opinion on Sprague's need for a nonhazardous work setting.  Moreover, Dr. Rethinger opined that Sprague needed this restriction "due to her MDI and physical problems," not due to her mood disorder or any other mental impairment.  Tr. 469.  Thus, the portion of the RFC that restricts Sprague from exposure to hazards is supported by the record.

### C.    **Fibromyalgia**

Sprague does not challenge the ALJ's conclusion that Sprague's fibromyalgia was not a severe impairment, but instead contends that the ALJ erred by failing to consider this impairment when formulating her RFC.

The ALJ pointed out that while Sprague was noted to have fibromyalgia in March 2010, "the record nowhere contains an examination done that involves a tender points evaluation," Sprague was never referred to a rheumatologist, and she does not "consistently receive a fibromyalgia diagnosis."  Tr. 13.  Contrary to this statement, on July 27, 2010, Miracle performed a manual tender point survey and found "14/18 tender points positive and 0 control points."  Tr. 553.  Miracle concluded that Sprague met the "criteria for fibromyalgia [FMS]

which is not a disease rather a syndrome secondary to central sensitization likely from her chronic disease states" and referred her to a rheumatologist.  Tr. 554-55.  Miracle noted that Sprague reported "the worst pain" everywhere which was constant and deep in her tendons, joints, muscles, and bones.  Tr. 550.  Sprague described the pain as sometimes tingling, burning, or sharp, appearing in random places, and sometimes "spikes."  Tr. 551.

Although the ALJ was incorrect about the absence of a tender point evaluation and referral to a rheumatologist, she was correct that Sprague did not "consistently receive" a fibromyalgia diagnosis.  However, Sprague's July 2010 pain and fatigue complaints related to fibromyalgia were very similar to those she had been reporting for years to her numerous treating sources as discussed above.  When forming the RFC assessment for someone with fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 2012 WL 3104869, at * 6 (July 25, 2012).

Miracle is the only treating source who affirmatively diagnosed Sprague with fibromyalgia, and, as a nurse practitioner, is not an acceptable medical source.  *See* 20 CFR § 416.913(a); *Molina v. Astrue*, 674 F3d 1104, 1111 (9th Cir 2012).  Since no acceptable medical source conducted tender point testing and diagnosed Sprague with this condition, the court cannot conclude that Sprague's fibromyalgia is a medically determinable impairment for purposes of establishing disability.  Nonetheless, the ALJ did not fairly evaluate the medical evidence by considering the entire record to determine whether Sprague's alleged fibromyalgia symptoms waxed and waned.  By failing to mention or otherwise discuss what impact, if any, Sprague's fibromyalgia had on her ability to perform sustained work activities on a regular and continuing basis, the ALJ erred.

D.    **Seizures**

Sprague argues that the ALJ erred by failing to consider her seizures when formulating her RFC.  Though Sprague had been treated for seizures in the past, the ALJ concluded that the "most recent medical treatment records describe . . . seizures as part of [Sprague's] past medical history" and, therefore, ascribed no limitations to it.  Tr. 12-13.

As early as 2004, Sprague reported experiencing petit mal seizures and began seeing a neurologist.  Tr. 522-23.  Between 2005 and 2007, Sprague's seizures were mostly well-controlled with medication, though the dosage was sometimes modified.  *See* Tr. 520 (Sprague reported in March 2005 that since beginning Lamictal her seizures were better controlled); Tr. 511, 514 (Sprague reported in 2006 that she was having only one to three seizures a day since she had been taking Lamictal and Gabapentin, which was down from the seven to ten per day without medication); Tr. 263-64 (Sprague reported in May 2007 that she had recently felt lightheaded and blacked out for a few minutes, but had no further episodes once her anti-seizure medication was adjusted); Tr. 250-54, 276, 499 (seizures improved throughout 2007-2008 when modifying medication).  However, during some periods Sprague's seizures seemed to worsen, even when on medication.  *See* Tr. 237-38, 309-10, 332-34, 336, 350, 502 (2007 increase in seizure activity).

During the nearly two-year gap in treatment for most of 2008-09 due to the lack of health insurance, the record is largely silent regarding seizures.  This period includes the onset date adopted by the ALJ.  However, during her February 2009 evaluation with Dr. Smolen, Sprague reported that her untreated seizures were "not too bad."  Tr. 365.  Once Sprague began receiving regular medical treatment, she again reported frequent seizures but did not consult a neurologist right away.  Tr. 426-27, 441-44.  On July 27, 2010, Sprague

reported experiencing daily headaches and dizziness, as well as seizures if under "a certain type of stress," such as when her pain is exceptionally severe. Tr. 551. She described her seizures as short periods characterized by zoning out, rapid eye blinking, and loss of memory. *Id*. On November 3, 2010, the date of the last medical record, Sprague reported that she was still experiencing daily seizures which usually lasted only a few seconds and was referred to a neurologist. Tr. 614.

Despite the many treatment notes referring to Sprague's seizures, they appear to be largely controlled by medication which was periodically modified. One abnormal EEG in April 2007 occurred during a period when Sprague's medication was being modified. *See* Tr. 263, 332-34, 350, 356-57. By June 2007, Sprague reported that the seizures were again well-controlled after modification of her medication. Tr. 252, 499. When she resumed regular medical treatment in December 2009, she continued to report seizures but was not referred to a neurologist until November 2010. This leads to the reasonable conclusion that though she was experiencing seizures, they were not so severe as to interfere with her normal activities in daily living. That conclusion is bolstered by her report to Dr. Smolen that her unmedicated seizures were "not too bad." Tr. 365.

Consequently, the ALJ's evaluation of the evidence regarding Sprague's complaints of seizures is an accurate reflection of the medical evidence as a whole. Moreover, Sprague does not allege any functional limitations related to her seizures, and no evidence in the record indicates that Sprague suffered any work-related restrictions due to her short and mostly controlled seizures. To the extent that seizures require Sprague to avoid hazards, that limitation is included in her RFC. Consequently, the ALJ's evaluation of the medical evidence relating to Sprague's seizures is not erroneous.

### E.    <u>Anxiety</u>

Finally, Sprague alleges that the ALJ failed by not addressing her anxiety.

The ALJ did not consider Sprague's anxiety a severe impairment and did not mention it

much at all, probably due to the limited medical evidence.  In 2003, Sprague reported

having anxiety at school when her medication wore off.  Tr. 542.  In 2007, Dr. Swiff noted

that attending school full-time was too physically demanding which "aggravates [Sprague's]

anxiety."  Tr. 491-92.  On May 5, 2008, Dr. Swiff reported that Sprague was "overwhelmed

by her many stressors" and her health.  Tr. 364.  Despite this anxiety, Dr. Swiff noted that

Sprague's sleep, energy, and appetite were good, her thoughts were clear and goal directed,

and her psychotic disorder, petit mal seizures, hypothyroidism, and diabetes were under

adequate control.  *Id*.  On July 9, 2008, Dr. Rethinger concluded that Sprague suffers from

"anxiety c/o" which did not meet or equal any listing.  Tr. 473, 476.  Finally, in July 2010,

Sprague reported that she has increased anxiety and mental tension when she experiences

pain spikes.  Tr. 551.  None of these treatment records indicate that Sprague has any

functional impairments associated with her anxiety.  Consequently, the ALJ did not err by

failing to incorporate limitations relating to Sprague's anxiety into the RFC.

### F.    <u>Conclusion</u>

The ALJ's RFC assessment does not reflect a proper analysis of the medical evidence.  In

forming Sprague's RFC, the ALJ relied primarily upon the consulting physicians who ignored

the opinions and extensive treatment records provided by her treating physicians regarding her

complaints of pain and fatigue associated with Fanconi's anemia.  Crediting the treating

physicians' opinions as true, the RFC is not an accurate statement of the work-related activities

that Sprague can perform despite her functional impairments.  Though the ALJ did not err in her

treatment of Sprague's mood disorder, seizures, or anxiety, she misstated the medical evidence relating to Sprague's fibromyalgia.  Because the RFC fails to account for limitations related to Sprague's fatigue and pain, the RFC is not supported by substantial evidence.

## II.    Sprague's Credibility

Sprague next argues that the ALJ improperly discounted her testimony regarding the severity of her limitations.  When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms.  20 CFR § 416.929.  In the event the ALJ determines that the claimant's report is not credible, such a determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  Unless the record has affirmative evidence of malingering, the ALJ must offer clear and convincing reasons for rejecting the claimant's testimony about the severity of her symptoms.  *Carmickle*, 533 F3d at 1160.

When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment.  *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996).  In weighing a claimant's credibility, the ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations.  *Id*.  In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately

> explained failure to seek treatment or to follow a prescribed course
> of treatment; and (3) the claimant's daily activities.

*Id*; *see also* SSR 96-7P.

A finding that a claimant lacks credibility cannot be premised solely on a lack of medical

support for the severity of pain. *See Lester*, 81 F3d at 834. However, a credibility finding

supported by substantial evidence in the record cannot be disturbed. *Thomas*, 278 F3d at 959,

citing *Morgan v. Comm'r*, 169 F3d 595, 600 (9th Cir 1999).

Here, the ALJ concluded that Sprague's testimony was not credible concerning the

intensity, persistence, and limiting effects of her symptoms. Tr. 15, 19. Since there is no

evidence of malingering, the ALJ was required to provide clear and convincing reasons to reject

Sprague's testimony regarding the severity of her symptoms and the limitations associated with

these symptoms.

### A.    Activities of Daily Living

In discrediting Sprague's account of the severity of her symptoms, the ALJ pointed to

several inconsistencies in the record concerning her activities of daily living. Tr. 19. An ALJ

may rely upon inconsistences in finding a claimant not credible. *Smolen*, 80 F3d at 1284.

However, a plaintiff's level of activity is relevant to the credibility finding only if it is

inconsistent with claimed limitations. *Fair v. Bowen*, 885 F2d 597, 603 (9th Cir 1986).

Many home activities are "not easily transferable to what may be the more grueling

environment of the workplace." *Id*. But "if a claimant is able to spend a substantial part of

his day engaged in pursuits involving the performance of physical functions that are

transferrable to a work setting . . . [this] may be sufficient to discredit an allegation of

disabling excess pain." *Id*.

First, the ALJ found Sprague's complaints of fatigue and pain to be "inconsistent with her assertions to her medical providers that in April of 2010 she walked frequently, sometimes up to six or seven miles a day, and has good energy."  Tr. 19.  The ALJ added that in July 2010, Sprague "admitted walking two to three miles every day" and as recently as November 2010 reported that she "walks a lot."  *Id.*

A review of the medical records reveals that on April 1, 2010, Sprague did report to Dr. Hettinger that since her visit five months earlier, she had restarted her medication, was experiencing decreased fatigue, had good energy overall, and was walking frequently, up to seven miles a day.  Tr. 589.  However, just a few months later in July 2010, Sprague reported that her pain "spikes" had dramatically increased.  Tr. 569-74 (July 8, 2010 emergency room visit for complaints of severe pain); Tr. 560-67 (July 16, 2010 emergency room visit for complaints of severe fatigue); Tr. 550-59 (July 27, 2010 initial appointment with Miracle for complaints of chronic pain).  During this same period, Sprague worked for one week at a Summer Youth Employment Program doing housekeeping work at a senior living facility five days a week for four hours a day.  Tr. 599.  During her first week of work, Sprague was out sick for two days and quit because she was not able to keep up with the physical demands.  *Id*.  On November 3, 2010, Danielle Blackwell, FNP, did indeed note that Sprague "walks a lot" and, therefore, needed pain medication to alleviate her back pain, which had recently worsened.  Tr. 613-14.

Rather than assessing the entire medical record, the ALJ excerpted two notations from the most recent year of treatment to undermine Sprague's credibility.  The ALJ did not take into account those records where Sprague reported severe fatigue and pain that interfered with her daily activities and which appeared to worsen in the summer and fall of

2010.  The ALJ also did not take this into account when evaluating whether Sprague's activities of daily living were consistent with her ability to work.  Many of the treatment notes suggest that Sprague's pain and fatigue worsened after April 2010 and prevented her from fulfilling the physical demands of at a part-time job.  The fact that Sprague could sometimes walk long distances is only partially supported by the record, and, thus, is not a clear and convincing reason for rejecting Sprague's testimony regarding the limiting effects of her symptoms.

The ALJ further discredited Sprague's testimony because she reported an ability to do household chores, including cleaning, washing dishes, vacuuming, cooking, and shopping, and because her mother stated that Sprague sometimes spends "hours and hours, sometimes days," drawing and reading.  Tr. 19.  As discussed above in connection to Sprague's limitations related to her Fanconi's anemia, the medical record is replete with instances where Sprague's fatigue and pain would wax and wane.  Some days would be "good days" where she could be quite active and focus on the task at hand, while at other times, she had bad days where she would not be able to leave the house.  *See* Tr. 245-49, 418-21, 489-90, 520, 523-24, 550-51, 560-67, 569-74.

Sprague acknowledged the existence of good and bad days.  On April 10, 2009, she completed a Disability Report, noting daily fatigue and pain with more "spikes" since January 2009.  Tr. 170.  She also expressed difficulty with depression, high glucose levels, sleeping, and focusing in general.  *Id*.  She reported losing 17 pounds over the last several months, no appetite, and not taking care of her personal hygiene needs.  Tr. 172.  When the pain would get too intense, Sprague would "try to keep occupied and out of light and

stimulation, or talk with someone," but reported that overall, she had "been in real trouble over the last several months due to [her] disability and the pain levels." Tr. 172-73.

At the hearing held on November 30, 2010, Sprague testified that she had to quit her part-time job at the nursing home due to "major fatigue, too much pain, [and] some confusion on the job." Tr. 39-40. She felt that she could not work due to major fatigue and intense pain which she experienced every day. Tr. 41. She had dizzy spells that "vary from day to day," and noted that while her health could be "great" one day, the next day it could be "the entire opposite," making her wholly undependable. *Id*. She reported having more bad days than good days with an average of four bad days per week. Tr. 60. On a "bad day," she experiences lots of pain, high fatigue, and generally feels very weak and cannot do much other than lay around. Tr. 60-61. She could usually perform household chores, cook, and take walks, though these activities are becoming more challenging for her. Tr. 50. She used to walk two to seven miles at a time, but in the month prior to the hearing, her ability to walk had deteriorated to only half a mile. *Id*. She napped two to 12 hours, but usually three hours, three to four times a week. Tr. 57-58.

The fact that Sprague could sometimes perform household chores and sometimes spent long periods drawing and reading is not inconsistent with the record as a whole. The medical records clearly support her testimony that depending on the severity of Sprague's pain and fatigue, she has good days and bad days, and that the level and type of activity is directly correlated to whether she is having a good or a bad day. Consequently, the fact that Sprague could perform household chores and spend long periods drawing and reading is not a clear and convincing reason to reject her testimony.

Finally, the ALJ noted that though Sprague testified that she had not traveled since November 2008, her mother "suggested" that she took a multi-day road trip to California since that time.  Tr. 19.  The record does not establish one way or the other whether Sprague went on a trip to California, but even if she did, the ALJ failed to discuss how this level of activity is inconsistent with Sprague's claimed limitations.  *See Fair*, 885 F2d at 603. Consequently, the record only partially supports this reason for the negative credibility finding.

### B.    <u>Marijuana Use</u>

In addition, the ALJ found that Sprague's account of her symptoms was undermined because of her "inconsistent and inaccurate statements" about her use of marijuana.  Tr. 19-20. Inconsistencies in a claimant's testimony regarding drug use are a permissible basis for an adverse credibility finding.  *See Thomas*, 278 F3d at 959; *see also Verduzco v. Apfel*, 188 F3d 1087, 1090 (9th Cir 1999).

At the hearing Sprague testified that she had been using medical marijuana since mid-September 2010 since her Gabapentin was not helping her fibromyalgia pain.  Tr. 47-49.  She acknowledged that she did not have a medical marijuana card and that none of her doctors were aware that she was using it medicinally.  *Id*.  However, Miracle noted on July 27, 2010, that Sprague had been using medical marijuana, but did not mention a medical marijuana card or when Sprague began using marijuana for pain relief.  Tr. 550.

While Sprague she may not have actually possessed a medical marijuana card and may have been unsure when she started using marijuana, this is not a clear and convincing reason to find her not credible.  Given the medical evidence of a mental impairment affecting her ability to remember, a two month mistake about when she started using marijuana cannot be viewed as an

intentionally misleading statement.  Although  no treatment providers suggested that Sprague would benefit from medical marijuana,  she did mention her use to at least one treating source, Miracle.  Thus, the ALJ erred by concluding that Sprague's testimony was sufficiently inconsistent about her drug use to find her not credible.

### C.    Medical Source Reports

Finally, the ALJ concluded that Sprague's account of her functional limitations was not credible because "no medical source reported that [she] is unable to perform sedentary or light work."  Tr. 19.  In support, the ALJ listed several treatment notes, namely that Sprague reported in November 2010 that she "walks a lot," that her most recent laboratory findings associated with her Fanconi's anemia revealed stable blood counts, thereby discounting her accounts of fatigue and pain, and that Dr. Smolen concluded that Sprague could understand, remember, and understand with only mild impairment.  Tr. 19.   However, as discussed above, at least two of these reasons are not clear and convincing.  The ALJ's rejection of Sprague's testimony regarding her ability to walk long distances was not supported by clear and convincing evidence, and the ALJ improperly ignored the extensive medical evidence and opinion testimony from Sprague's treating physicians regarding the limiting effects of her pain and fatigue.   Thus, this reason for the negative credibility finding is not supported by the record.

### D.    Conclusion

The ALJ did not provide clear and convincing reasons, supported by substantial evidence, to reject Sprague's testimony regarding the limiting effects of her impairments. Though some of her activities of daily living, such as walking long distances, performing household chores, and reading and drawing for long periods of time, are the kinds of activities that require concentration and persistence, the ALJ ignored the extensive medical

and testimonial evidence in the record that established that Sprague's ability to engage in these activities was wholly dependent on the severity of her pain and fatigue, which often varied from day to day.   Consequently, the ALJ erred in discounting Sprague's account of the limiting effects of her symptoms.

### III.    Lay Witness Testimony

Sprague also challenges the partial rejection of the testimony offered by her mother, Brenda Witherspoon, which the ALJ gave only "limited weight.  Tr. 18.

Lay witness testimony, including from family members, about their own observations regarding the claimant's impairments must be considered by the ALJ.  *Smolen*, 80 F3d at 1288. Testimony from lay witnesses who see the claimant on a regular basis is of particular value because they can often ascertain whether the claimant is malingering or truly suffering.  *Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993).  To discount the statements of lay witnesses, the ALJ must give "germane reasons."  *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001).  Inconsistency with the medical evidence may constitute a germane reason.  *Id* at 512.  "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  *Stout v. Comm'r*, 454 F3d 1050, 1056 (9th Cir 2006).

On December 26, 2008, Witherspoon completed an Adult Function Report regarding Sprague's impairments.  Tr. 147-54.  At that time, Sprague was not living at home, as she had moved out in June 2008 and had been staying with friends.  Tr. 147, 154.  Based on her telephone conversations and visits, she reported that Sprague usually sleeps for most of the day, reads, plays video games, and walks "four to five miles" to visit friends.  Tr. 147.

Though she likes to walk, the distance varies from two blocks to two miles, depending on "a lot of factors." Tr. 152. Sprague's lifestyle is "completely dependent on daily fluctuations of pain." Tr. 148. Sprague could clean, bathe, shave, feed, and otherwise take care of her personal care needs, but she sometimes pulls out her eyelashes, over plucks her eyebrows, and shaves off all body hair "fuzz," which Witherspoon believed to be part of Sprague's schizoaffective disorder. *Id*. Though Sprague could prepare her own food, she takes "hours," can only make simple meals and is not able to follow recipes. Tr. 149. Witherspoon stated that Sprague is too confused to handle money or pay bills. Tr. 150-51. Sprague's hobbies include reading, playing video games, writing short stories, and drawing elaborate portraits. Tr. 151. The type and duration of her activities depends on her level of pain. *Id*. Sprague often needs someone to accompany her when she leaves the house because she gets easily confused. *Id*. Witherspoon also noted that Sprague "has difficulty with long term involvement with any interest and has difficulty completing school due to . . . being unpredictable," a very short attention span and is completely unable to handle stress. Tr. 152-54.

On February 3, 2009, Witherspoon completed a Third Party Adult Function Report. Tr. 155-62. At that time, Sprague was staying with friends, and her typical day depended on the amount of pain or fatigue she was feeling. Tr. 155. When not feeling well, she usually stays in bed, draws, listens to music, or watches movies with low lights. *Id*. On good days she will walk to her friends' houses and do laundry or other housework. *Id*. Though Sprague has always struggled with fluctuating fatigue, she used to be able to spend more time with her friends and have a better quality of life. Tr. 156. When not feeling well, Sprague will take daily walks, but when in pain, she usually does not venture out alone,

though occasionally might take a short walk with someone else.  Tr. 158.  Her hobbies include reading, drawing, watching old movies, and writing short stories, but when not feeling well, her activities are limited to listening to soft music and drawing.  Tr. 159. Witherspoon noted that Sprague's ability to lift, squat, stand, reach, walk, kneel, climb stairs, understand, follow instructions, complete tasks, concentrate, and remember are compromised by her fatigue and pain.  Tr. 160.  She can "usually" walk for 30 minutes before needing to rest, and needs to rest for approximately ten minutes before resuming walking, though "this varies day to day."  *Id*.  She can pay attention for an average of three to ten minutes and does not finish what she starts, whether it be a conversation, chores, or watching a movie.  *Id*.  She cannot follow instructions because she gets confused and often hears something other than what is said.  *Id*.

At the hearing, Witherspoon testified that Sprague had been living with her, but moved in with her boyfriend in June 2010.  Tr. 63.  Because Sprague's average day was influenced by how she was feeling, it was hard to plan activities in advance.  *Id*.  If she was feeling good, they might go for a walk or to a movie, but when not feeling good, they would just keep the lights low and listen to soft music.  *Id*.  Witherspoon noted that because Sprague likes to do lots of reading, they would often go to the library together; but when Sprague was not up for it, Witherspoon would pick up her books for her.  *Id*.  As for helping around the house, Sprague could wash and fold her own clothes and could cook very simple meals; following directions is very confusing unless she has help.  Tr. 64.

When she lived at home, Sprague liked to go for walks, usually for about 30 minutes at a slow pace, but on some days, she only had the energy to go to the mailbox which was less than a block away.  Tr. 64-65.  During the summer of 2009, Sprague was having a

"really good summer" and would walk three to six miles a couple of days a week. Tr. 65.
Though she could not recall for certain, she thought Sprague may have gone on a three or
four day road trip to California. *Id*. Sprague's hobbies include drawing, and she will
"spend hours and hours . . . sometimes days" drawing. *Id*. On an average day, she will
spend an hour or two reading, though this time could vary; if a book is really good she can
"read for days" until she finishes the book, but at other times she might just flip through a
magazine for five minutes. Tr. 66. The previous spring Sprague had worked hard to take
classes to get her GED. Tr. 66. Witherspoon characterized this as a "good, short moment of
time" for her, which lasted about two or three months. *Id*. Though she had a few days
where she was "down," overall she felt really good during this period and worked hard to
achieve her goal. *Id*. Witherspoon opined that Sprague's problems with dependability
would get in the way of her working full-time. Tr. 68-69. She also can become confused,
often if she is in a lot of pain or is especially fatigued. Tr. 69.

   The ALJ rejected Witherspoon's testimony for three reasons: (1) because she had not
lived with Sprague since June of 2010, she had only limited knowledge of her day-to-day
activities; (2) her opinion is "likely colored by her natural affections and desire to care for her
daughter;" and (3) her statements are not consistent with other evidence in the record. Tr. 18.
While these are specific reasons for rejecting Witherspoon's testimony, they are not supported by
the record. Despite not living with Sprague continuously, Witherspoon sees and talks to Sprague
regularly. Moreover, there is no evidence that Witherspoon's affection for her daughter in any
way colors her perception of Sprague's abilities, especially in light of the fact that her testimony
is largely consistent with the bulk of the objective medical evidence. In fact, Witherspoon's
testimony corroborates other evidence in the record which establishes that the limiting effects of

Sprague's impairments varies on a daily basis. This is precisely the same opinion offered by Sprague's treating physicians and which was improperly ignored by the ALJ. Since Witherspoon's testimony supports the opinions offered by Sprague's treating physicians, the ALJ's reasons for rejecting her testimony, while specific to Witherspoon, were not relevant or supported by the record.

## IV.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d, 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing

*Bunnell*, 947 F2d at 348.  The reviewing court declines to credit testimony when outstanding

issues" remain.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting the opinions of two treating

physicians, the symptoms related to fibromyalgia, and the testimony of Sprague and her

mother.  Thus, that evidence should be credited as true.  *See Harman*, 211 F3d at 1179;

*Smolen*, 80 F3d at 1281-83; *Varney*, 859 F2d at 1398.

Turning to the other two facets of the *Harman* inquiry, this court finds that no

outstanding issues must be resolved before a determination of disability can be made and

that it is clear from the record that the ALJ would be required to find Sprague disabled if the

evidence is credited.

As discussed above, Drs. Kurre and Swiff opined that Sprague suffers episodic fatigue

and easy exhaustion which prevents her from performing well in a rigorous environment or at an

unremitting pace (Tr. 489) and that regular attendance can be too physically taxing for her

(Tr. 492).  Admittedly, these statements do not necessarily shed light on what work-related

activities outside a rigorous environment and without an unremitting pace or strenuous physical

requirements Sprague can perform on a sustained, regular, and continuing basis.  However, in

2010 Sprague tried, but could not, maintain even a part-time housekeeping job due to its physical

demands.  Even if Sprague could perform a job with fewer physical demands, the record shows

that her pain and fatigue would preclude competitive full-time employment.  According to the

testimony of both Sprague and her mother, Sprague has good days and bad days and that the bad

days, which average four per week, outnumber the good days.  During a bad day, Sprague's

severe pain and fatigue limit her activities to the point where she avoids light and stimulation,

lays around, naps, listens to music, draws, and reads.  Such limitations would preclude any

employment on her bad days. Because her condition varies greatly, she is undependable and would have to miss work more than two days a month.

When presented with a hypothetical that incorporated the limitation of missing more than two days a month due to fatigue, the VE testified that such an individual would be unable to maintain competitive employment. Tr. 72. The Ninth Circuit has remanded for payment of benefits when the VE testified that the limitations found by an improperly rejected medical opinion would render the claimant unable to engage in any work. *See Harman v. Apfel*, 211 F3d 1172, 1180 (9th Cir 2000), citing *Varney v. Sec'y of Health & Human Svcs.*, 859 F2d 1396, 1400 (9th Cir 1988); *Smolen*, 80 F3d at 1291; *Reddick*, 157 F3d at 729; *Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984). Since Sprague's episodic fatigue renders her unable to sustain regular attendance, remand for further administrative proceedings serves no useful purpose and is unwarranted.

## **ORDER**

For the reasons discussed above, the Commissioner's decision is REVERSED AND REMANDED pursuant to Sentence Four of 42 USC § 405(g) for an award of benefits.

DATED May 28, 2013.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge